**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SASHA M.,

        **Plaintiff,**

    v.                           **Civil Action 2:22-cv-2101
Judge Edmund A. Sargus
Magistrate Judge Kimberly A. Jolson**

COMMISSIONER OF
SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Sasha M., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her application for SSI on May 8, 2019, alleging that she was disabled beginning June 5, 2016, later amending her onset date to the date of application was filed, due to hip pain and surgery, screw in right leg, titanium plate in right, type 2 diabetes, herniated disc, muscle spasms, anxiety, depression, post-traumatic stress disorder, intellectual disability, adjustment disorder with mixed moods, stomach problems, and past physical and sexual abuse. (R. at 106, 368). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on December 17, 2020. (R. at 165–204). The ALJ denied benefits in a written decision on January 13, 2021. (R. at 103–30). That became the final decision of the Commissioner when the Appeals Council denied review. (R. at 1–6).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record (Doc. 8), and the parties briefed the issues (Docs. 13, 15).

## A. Relevant Hearing Testimony and Statements to the Agency

The ALJ summarized Plaintiff's hearing testimony and statements to the agency as follows:

[Plaintiff] testified: she is 5 feet, 6 inches tall; she weighs about 250 pounds. She has no income. She graduated from high school and attended some college. She was in special classes; she had some help in math and English. Her grades ranged from A to F but she could not remember how many "F"s she received. She can read a short one- or two-paragraph article but she cannot read big words. She could read a grocery-store shopping list and she could write a short message in a greeting card. She stated she can do some math but she cannot remember how to divide. She has trouble making change; she stated she would get $4.25 back if she paid for a $1.50 soda with a five-dollar bill. She last worked at a church camp. She is not currently working. Her doctor told her she is limited; Dr. Heather Daly gave her a work excuse for job and family services. She stated this doctor told her she was limited in standing and walking. She stated she can lift and carry five pounds because of her shoulders, back, and legs. She can stand for five or ten minutes at one time. She does not know how long she can walk. She has difficulty sitting down because of her herniated disc; she can sit for five or ten minutes. She stated diabetes affects her because she is sometimes high or low and she gets shaky. She takes her medicine but it is still a battle; she has help to remember taking her diabetes. When her husband is around, he helps her remember to take her medication. She got married in June 2020 but she does not yet live with her husband. They had a small wedding in a park; there were about ten people. She helped plan the wedding but it was a low-budget wedding; a friend made a big dinner and they had wedding cake. Once, when her blood sugar was low, she almost blacked out. She has some problems with memory; she sometimes forgets the date. She writes things down on a calendar but sometimes forgets to write appointments down. She gets to appointments by car transportation or her husband takes her when the car is working. She used to walk places but it makes her nervous to walk where she lives. When she goes to the doctor's, she can go in by herself because of COVID. Before COVID, her husband would go in with her. The virus has made her feel more isolated; she can no longer visit her mother or her great uncle in Florida. She still has problems with her left leg; she broke her hip during childhood. She had to have a revision surgery in her teens and her leg has not been the same since. She has difficulty walking around and getting in the shower. She used to have a cane and she was more recently given a walker because of cellulitis. She stated she should start using the walker but she tries to be independent; she noted she should not be embarrassed of using it. She has used the walker this month. When she had cellulitis in her right leg, she was advised to use the walker. She has pain in her left side of the back; the doctors told her the problem was in the middle. She has difficulty cleaning the apartment; she takes medication for muscle spasms and is looking for

2

another back doctor. She has not had other specialized treatment. She has asthma and still has problems with breathing. She takes medication for it; she has not had to go to the emergency room or urgent care center for breathing problems, but she would go if she needed to. One of her legs is shorter than the other. She lives in her apartment by herself; she has lived there over two years. Her husband makes sure the gas and electric bills are paid but she did this before they were married. She was able to pay bills correctly. If her husband was not paying the bills, she could do it if she had the money. She can go to restaurants or stores with her husband or friends. She can go into stores by herself; she does not like big crowds. If she is around too many people, she has a panic attack; her heart beats fast and her hands get clammy. If she counts to ten, she calms down. She has difficulty paying attention but she does not know how long she can do it. She can watch television; she likes to watch comedy shows. She can watch an hour-long show if she pauses it to move around or use the restroom. She also likes to color during the day; she can sit for five to ten minutes. She feels worse since she completed the Function Report; her herniated disc hurts more. Other abilities have stayed the same. Her cellulitis took several months to heal up. She still has a scar and it still swells up a little bit. To keep her apartment clean, she can wash the dishes and vacuum. She can sweep for five or ten minutes before she has to take a break and sit on the couch because she feels stiff. She is most comfortable on the couch. She receives services through Integrated Health; they take her to the grocery store. She has a contact, Courtney Queen, that calls her once per week, but this has changed since the virus. She talks to her about how she is doing. Dr. Abigail McGee is Courtney's boss and she also evaluated [Plaintiff]. She sees nurse practitioner Brewster every three months. [Plaintiff] feels depressed; she feels down and out. She feels this way often. She has crying spells every two or three days and she goes to sleep after this happens. (Hearing Testimony).

She endorsed similar symptoms in her August 2019 Function Report, noting she could not focus or concentrate and could not do certain tasks such as lifting heavy object, walking far, standing, climbing, or sitting long. She reported she lived by herself in an apartment; she could perform personal care with pain. Her back pain affected her sleep. She could prepare meals and do housework such as washing dishes, sweeping, and putting away clothes. In her Function Report, she noted she did not need reminders for personal needs or medications. She could get around by walking, riding in a car, or using public transportation. She could handle money but had no income to pay bills. She could shop in stores and go out alone. She could visit with others and engaged in hobbies including reading, listening to music, watching DVDs, cooking, and baking. She went to church twice each week. She reported some difficulty getting along with others as well as difficult understanding and following instructions. She could pay attention one to three minutes. (Exhibit 3E).

(R. at 113–15).

### B. Relevant Medical Evidence

The ALJ discussed the medical evidence as to Plaintiff's physical impairments as follows:

*** Records from prior to [Plaintiff]'s amended onset date show she received an epidural steroid injection and had improvement with the treatment in 2018. She reported ongoing pain in late 2018 and was referred for physical therapy. Records from May 2019 indicate [Plaintiff] had persistent low back pain and left lower extremity radicular symptoms limiting her mobility. She was advised to continue Meloxicam and to obtain updated imaging. (Exhibit 3F). Primary care records show [Plaintiff] was also prescribed Tizanidine for spasms. (Exhibit 5F). A May 2019 MRI showed no significant change from her prior 2017 imaging. Dr. Casey Chamberlain noted persistence of stenosis greatest at L3-L4 with associated left foraminal disc protrusion and L4-S1 with contacting the descending left S1 nerve root. She complained of low back pain, a history of chronic left hip pain after a childhood fracture with surgery, and an abnormal gait. Dr. Chamberlain recommended physical therapy and Meloxicam. On examination at that time, she showed tenderness and positive SI joint tenderness with positive facet loading. Her straight leg raise showed increased back pain and her reflexes were depressed in bilateral lower extremities. (Exhibits 3F, 4F, 6F). She engaged in physical therapy but reported little improvement in July 2019. (Exhibit 7F). A December 2019 lumbar spine x[-]ray showed multilevel degenerative changes in the lumbar spine but no acute findings. (Exhibit 13F). In July 2020, [Plaintiff] requested a functional capacity test from primary provider Heather Dailey; she showed tenderness and pain and stiffness with range of motion. Her Tizanidine was refilled. However, she reported no specific complaints of back pain in August or November and her physical examination was unchanged. (Exhibits 21F, 22F). Records show [Plaintiff]'s weight is also obese, with a BMI over 38 for much of her alleged disability period. She was counseled on weight loss and glucose control. (Exhibits 2F, 5F, 13F).

[Plaintiff] appeared for a Functional Capacity Examination in August 2020 with physical therapist Blair Taylor. She reported a medical history of hypertension, degenerative disc disease, borderline delay of cognitive development, right lower extremity pain, type 2 diabetes, low back pain and muscle spasms. She had prior surgery on her back. She alleged difficulty sitting or standing for prolonged periods due to back pain; her back bothered her during sleep and with household tasks. She lived on the second floor and had difficulty with the stairs. She admitted she was independent with activities of daily living but with difficulty. She had difficulty going from sitting to standing due to weakness and pain. She shopped once every other week with assistance from her mother. On examination, she reported some numbness and tingling in the left lower extremity. She had poor body mechanics for motions. She had normal range of motion with upper extremities and mildly decreased strength in the shoulders, elbows and wrists. She had decreased strength in bilateral hip flexors and mildly decreased strength in bilateral knees and ankles.

She had generally full range of motion in hips, knees, and ankles. She showed decreased gait mechanics. (Exhibit 18F).

Though [Plaintiff] had specialized care for her back pain in 2019, records show no ongoing treatment with pain management, orthopedics, or neurology. [Plaintiff] has not had any epidural steroid injections since her amended onset date, and her physical therapy engagement was brief. (Exhibits 3F, 4F, 6F, 7F). Records show she was otherwise maintained with medication prescribed by primary care but generally only demonstrated tenderness and stiffness on examinations. (Exhibits 21F, 22F). [Plaintiff] has been independent with activities of daily living including personal care, household tasks, dating and attending church despite back pain. (Exhibits 18F, Hearing Testimony). Records show decreased gait mechanics but no other need for an assistive device due to back pain; [Plaintiff] briefly used a walker due to an acute bout of lower extremity cellulitis. (Exhibits 21F, 22F). She acknowledged she lived on the second floor, with stairs, but could get out and about with some difficulty. (Exhibits 15F, 18F). She told her mental health providers she was capable of staying busy doing housework, including cleaning, and she made few mentions of back pain to her case manager or prescribing psychiatric provider. (Exhibits 14F, 15F, 19F). Given the evidence of conservative care since [Plaintiff]'s amended onset date with little specialized treatment for musculoskeletal pain, the [ALJ] concludes [Plaintiff]'s degenerative disc disease, obesity, and history of hip fracture are adequately accommodated by a restriction to light work except she can never climb ladders, ropes, or scaffolds; she can frequently balance; she can occasionally kneel, crouch, crawl, stoop, and climb ramps and stairs; and she is able to perform work requiring up to occasional exposure to dangerous machinery.

The claimant has type II diabetes, predating her alleged onset date. She has been treated with medications; however, she admitted in 2018 she missed doses, ate "whatever," and did not check her home sugars routinely. (Exhibits 2F, 5F). In January 2019, she admitted she had been out of all medications for a few weeks; she was restarted. She showed diminished sensations in her feet and she was encouraged to take medications as prescribed and adhere to lifestyle changes. Her A1C was 7.7 in April and 7.9 in July 2019; she admitted she was forgetting to take her medications. (Exhibit 5F). In October 2019, her A1C again rose to 8.4; she admitted continuing to forget medications. (Exhibit 10F). In 2020, the claimant's A1C improved; it was 8.2 in March and 7.7 in May 2020. She showed normal sensations on foot examination with normal strength; however, she had areas of calluses and was prescribed diabetic footwear. (Exhibit 13F). In August 2020, the claimant's A1C again improved to 7.5; she was watching her diet and taking medications as directed; by November, however, it had increased with the claimant acknowledging she was not watching her diet. (Exhibit 16F). The claimant testified to symptoms when she had poor glucose control; however, records show she was non-compliant with diabetes medication and recommended diet. (Exhibits 5F, 10F, 13F, 16F). Records show there were periods, however, when she was capable of maintaining treatment adherence; at those times, her symptoms improved. (Exhibit 16F). Regardless, there are few complaints of significant symptoms due to poor

sugar control; the claimant generally appeared at her primary care provider for medication refills and sought no endocrinology care for management of her diabetes. Given the evidence, the undersigned concludes the claimant's intermittent symptoms from poor diabetes control are adequately accommodated by restricting her to a reduced range of light work with postural limitations and reduced exposure to dangerous machinery.

Records show the claimant had a diagnosis of mild intermittent asthma without complication. She was treated with inhalers to use as needed. (Exhibit 13F). In December 2019, she requested a new inhaler as she had not had recent refills and had lost her prior inhaler. In 2020, she reported no recent flares or emergency room visits. Her lungs were clear on examinations. (Exhibit 13F, 16F). The claimant's asthma is adequately accommodated by restricting her to light exertion work with additional postural limitations; there is no indication she has environmental triggers.

(R. at 115–17).

The ALJ discussed the medical evidence as to Plaintiff's mental health impairments as

follows:

With respect to her mental health symptoms and borderline intellectual functioning, the [ALJ] concludes [Plaintiff] remains capable of at least simple, routine work. Records show [Plaintiff] has had borderline intellectual functioning since prior to her amended onset date. After a 2011 clinical interview with psychological testing, consultative examiner Dr. Alan White diagnosed [Plaintiff] with post-traumatic stress disorder, major depressive disorder, and borderline intellectual functioning with a Full[-]Scale IQ of 72. (Exhibit 1F). Recently, [Plaintiff] has treated with nurse practitioner Rebecca Brewster. In 2018, she reported symptoms of depression exacerbated by situational stressors. Ms. Brewster assessed schizoaffective disorder, bipolar type, and borderline delay of cognitive development; she noted [Plaintiff] was disorganized and difficult to follow in conversation. She advised her on returning for treatment to properly titrate medications. She encouraged her to consider counseling. Throughout 2018, she had ongoing situational stressors but could still take care of her home and get out to the store despite anxiety around others. In early 2019, [Plaintiff] reported moodiness and anxiety as well as sleep disruption; however, she also admitted she was not taking prescribed Lamictal and Abilify as prescribed. She denied suicidality but admitted some thoughts of self[-]harm. She was otherwise euthymic and cooperative, though her insight and judgment were impaired. Her Abilify was increased and she was again counseled on compliance. (Exhibit 5F). As of June, [Plaintiff] worked with Courtney Queen, a mental health specialist and case manager from Integrative Behavioral Health, who helped [Plaintiff] address utility issues, scheduling appointments, and applying for services. [Plaintiff] told Ms. Queen she remained involved in her church. (Exhibit 8F). In July, she was out of medications again and overwhelmed by

situational stressors; her mother had left the apartment and left [Plaintiff] to handle expenses. She admitted she was attending church and spending time with family but still had persistent depression and anxiety symptoms. Her medications were started again. (Exhibit 5F). By October 2019, [Plaintiff] reported her depression had eased and she was living in her own residence; she was also able to babysit once in awhile and get out around others. (Exhibit 9F).

In January 2020, she reported she was starting to feel better; she was using medications regularly and getting out more around others. On examination, she was cooperative with good attention. She was not suicidal. Her insight and judgment were fair. (Exhibit 15F). Ongoing progress notes from late 2019 into early 2020 from Courtney Queen indicated [Plaintiff] maintained a stable mood despite pain from her cellulitis and familial stressors. By March 2020, she acknowledged her basic needs were met and she was up to date on rent and utilities with the assistance of her church. Case management notes consistently indicate [Plaintiff] made good progress toward her goals. (Exhibit 14F). In March 2020 medication management notes, she reported she had a boyfriend whom she had been seeing for about eight months. She was considering marrying him. She noted her sleep was improved and found her focus was fair. She had lingering depression, but it would come and go. She was able to get out around others without anxiety or frustration. She was also spending time reading or watching television, despite not understanding all words. She went out to eat or went to the lake with her boyfriend; she still has some anxiety around larger crowds, but she was working on this. On examination, she was groomed with good attention and good eye contact. Her mood was normal and euthymic, though her affect was blunted. She had slightly scattered thought content but good articulation. Her insight was impaired but her judgment was fair. She was continued on the same medications. In June, she reported she was sleeping six to eight hours per night with only occasional insomnia. She was doing more housework and cooking as well as preparing for her marriage by getting her marriage license and finding a preacher. She was getting out around others and denied anxiety or irritability. Her insight and judgment were fair and she showed few other significant changes on mental status examination. Again, her medications were continued with no changes. Despite ongoing assessments of schizoaffective disorder, Ms. Brewster noted no symptoms of hallucinations or psychosis. (Exhibit 15F). June 2020 case management notes indicated [Plaintiff]'s boyfriend stayed with her often but did not live in her apartment. (Exhibit 19F). In August, she endorsed some anxiety and depression symptoms with less sleep and weight gain. Her sleep was affected by back pain. Her focus was fair and she spent time doing housework and listening to music. She showed a normal mood with slightly pressured speech; her attention was good and her insight and judgment were fair. She was slightly scattered but redirectable. She was continued on the same medications. (Exhibit 20F).

[Plaintiff]'s borderline intellectual functioning and symptoms of depression and anxiety have been managed with conservative care, even with medication non-compliance. [Plaintiff] reported improved symptoms with medications and

remained on a continued regimen since adhering to treatment. (Exhibits 15F, 19F, 20F). [Plaintiff] demonstrated the abilities to live on her own and perform independent activities of daily living; she performed housework, engaged in church activities, socialized, babysat, dated, and ultimately married. (Exhibits 9F, 15F, 19F, Hearing Testimony). [Plaintiff] showed no significant exacerbation of symptoms requiring a higher level of care; though she was assisted by case management, she did not seek additional counseling as recommended by her prescribing provider. Her mental status examinations show some abnormalities but [Plaintiff]'s insight and judgment improved with treatment compliance; she also demonstrated normal or euthymic moods and good attention. (Exhibits 15F, 20F). ***

(R. at 117–19).

### C. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since May 8 2019, the application date. (R. at 109). The ALJ determined that Plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine, type 2 diabetes, obesity, residuals of hip fracture, asthma, borderline intellectual functioning, and schizoaffective disorder, bipolar type with depression and anxiety. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (R. at 110).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently; she can stand or walk a combined six hours and sit six hours in an eight-hour day; pushing and pulling limited only by lifting and carrying; she can never climb ladders, ropes, or scaffolds; she can frequently balance; she can occasionally kneel, crouch, crawl, stoop, and climb ramps and stairs; she is able to perform work requiring up to occasional exposure to dangerous machinery; is able to remember locations and work-like procedures; able to understand, remember, and carry out short simple instructions in performing simple routine unskilled tasks as identified by the DOT where such tasks are not subject to a strict quota system, do not involve a machine setting the pace of work, and which have flexible standards as to the time, quality, and quantity; is able to maintain schedule attendance punctuality; requires no special supervision; able to perform work requiring up to occasional work in coordination with or in proximity to others; able to make simple work related

decisions; able to ask simple questions or request assistance; able to accept instructions from and respond appropriately to criticism by supervisors; able to interact with coworkers occasionally; able to be aware of normal hazards and take appropriate precautions; able to travel in unfamiliar places or use public transportation; able to set realistic goals or make plans independently of others; able to interact appropriately with the general public occasionally.

(R. at 112–13).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 115).

The ALJ determined that Plaintiff has no past relevant work. (R. at 124). Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a housekeeper cleaner, price marker, or a silver wrapper. (*Id.*). She therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since May 8, 2019, the date the application was filed (20 CFR 416.920(g))." (R. at 125).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of

9

the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ erred when crafting the RFC specifically as to her analysis of the state agency psychologists, Paul Tangeman, Ph.D., and Robyn Murry-Hoffman, Ph.D., and the opinions of Abigail McGee, M.Ed., LPCC-S, and occupational therapist Blair Taylor. (Doc. 13 at 15–23). In particular, she says the ALJ did not consider the supportability and consistency of the state agency psychologists' opinions, and the ALJ's departures from all of the above opinions were not supported by substantial evidence. (*Id.*). The Commissioner counters that the ALJ reasonably considered the evidence of record in determining Plaintiff's RFC. (Doc. 15 at 5–20).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.*; s*ee also* 20 C.F.R. §§ 416.913(a), 416.920c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 416.913(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 416.913(a)(2), (5).

medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 416.920c(b)(2). Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

### A. State Agency Psychologists

The ALJ discussed the medical source opinions and prior administrative medical findings of Paul Tangeman, Ph.D., and Robyn Murry-Hoffman, Ph.D. as follows:

> The [ALJ] considers the September 2019 opinion of State psychological consultant Dr. Paul Tangeman, who opined [Plaintiff] had moderate limitations in understanding, remembering, or applying information; moderate limitations interacting with others; moderate limitations in concentration, persistence, or pace; and moderate limitations in adapting or managing herself. He concluded she could do unskilled work and would be able to complete simple tasks up to five steps; she would need a static work environment with less strict production quotas, pace, and standards; she would need superficial interactions with others; and would need predictable change. (Exhibit 3A). This opinion is partially persuasive. The [ALJ] agrees the evidence of conservative mental health care and independent activities of daily living supports moderate limitations in functioning. (Exhibits 5F, 9F, 15F, Hearing Testimony). However, the [ALJ] concludes these moderate limitations are accommodated by restricting [Plaintiff] to work involving simple, routine tasks that are not subject to a strict quota system; occasional work in coordination with or proximity to others; and simple work-related decisions.

(R. at 120).

> On Reconsideration in March 2020, State psychological consultant Dr. Robyn Murry-Hoffman agreed there were moderate limitations. She concluded [Plaintiff] could do one- to two-step simple, routine tasks; she would need a static work environment with less strict production quotas, pace, and standards; she would need occasional and superficial interactions with others; and she would need predictable change. (Exhibit 4A). This opinion is partially persuasive. The [ALJ] agrees the evidence of conservative mental health care and independent activities of daily living supports moderate limitations in functioning. (Exhibits 5F, 9F, 15F, Hearing Testimony). However, the [ALJ] concludes these moderate limitations are accommodated by restricting [Plaintiff] to work involving simple, routine tasks that are not subject to a strict quota system; occasional work in coordination with or proximity to others; and simple work elated decisions.

(R. at 121).

Plaintiff says the ALJ failed to explain the supportability and consistency of either state psychological consultant opinion. (Doc. 13 at 15–19). The ALJ stated that she agreed with each state agency opinion insofar as the "evidence of conservative mental health care and independent activities of daily living supports moderate limitations in functioning." (R. at 120, 121) (citing R.

at 494–558, 797–881, 1429–40, 165–204).  While the ALJ did not use the "magic words" supportability and consistency, her line of reasoning addressed both.  *Cormany v. Comm'r of Soc. Sec.*, No. 5:21-CV-933, 2022 WL 2611952, at *7 (N.D. Ohio May 20, 2022), *report and recommendation adopted sub nom. Cormany v. Kijakazi*, No. 5:21CV933, 2022 WL 4115232 (N.D. Ohio Sept. 9, 2022) (citation omitted) ("The ALJ did not frame his analysis in terms of consistency or supportability, but the Commissioner is correct that 'magic words' are not necessary so long as the court is able to determine, based on a reading of the entire decision, how the ALJ considered the consistency and supportability factors.").

First, the ALJ cited to the same records upon which the state agency psychologists based their opinions—Plaintiff's mental health progress notes from 2018 and 2019.  (R. at 120, 121) (citing R. at 494–558, 797–881); (*see* R. at 239) (referencing R. at 530–33, 526–29, 522–25, 508–11, 498–501) (Dr. Tangeman assessing Plaintiff's progress notes before making his moderate limitation findings); (R. at 256) (referencing R. at 874, 801) (Dr. Murray-Hoffman assessing Plaintiff's reconsideration progress notes before making her moderate limitation findings).  In other words, she considered supportability and the opinions' "reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence."  *Mary W. v. Comm'r of Soc. Sec.*, No. 2:20-cv-5523, 2022 WL 202764, at *8 (S.D. Ohio Jan. 24, 2022) (citing *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021)).

Second, the ALJ relied upon additional records that were unavailable to the state agency psychologists—later progress notes from 2020 and Plaintiff's testimony at the hearing.  (R. at 120, 121) (citing R. at 1429–40, 165–204).  In other words, she considered consistency and the degree to which the opinions matched the evidence from other medical sources and nonmedical sources. 20 C.F.R. § 416.920c(c)(2).

While the ALJ did not discuss the weight of the supporting and consistent evidence in detail when evaluating the state agency psychologists' opinions, she did elsewhere in the opinion. And an ALJ's opinion must be read as a whole. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). In particular, the ALJ described in detail why the entire timeline of progress notes and Plaintiff's testimony at the hearing—among other evidence of record—supported findings of moderate limitations in the four functional areas:

> In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant testified she had some difficulty understanding when reading longer words; she also reported problems understanding in her Function Report. (Exhibit 3E, Hearing Testimony). Prior evidence showed a Full Scale IQ of 72 and a history of special education. (Exhibits 1A, 1F). However, the evidence also shows the claimant was capable of living on her own, engaging in church activities, babysitting, planning a small wedding and engaging in a relationship, preparing meals, handling money, shopping, and household tasks. (Exhibit 3E, 14F, 15F, 18F). Mental status examinations noted her intelligence was estimated to be below average, but her fund of knowledge was generally fair and her ability to name objects was good. (Exhibits 9F, 14F). Despite extra help with special education, the claimant graduated high school. (Hearing Testimony). Therefore, the undersigned concludes there are no more than moderate limitations in understanding, remembering, or applying information.
>
> In interacting with others, the claimant has a moderate limitation. The claimant endorsed anxiety with others, especially in larger crowds; she reported some difficulty getting along with others. (Exhibits 3E, 15F, Hearing Testimony). However, the claimant acknowledged during appointments she was able to get out and around others with improvements in her anxious symptoms. (Exhibits 5F, 9F, 15F). She noted she could attend church more than once a week, babysit, and engage in a relationship; she had a small wedding with about ten people in 2020. (Exhibits 3E, 15F, Hearing Testimony). Her affect was sometimes constricted or blunted, but she generally presented as cooperative and appropriately interactive. (Exhibits 5F, 9F, 15F). Given the evidence, the undersigned concludes there are no more than moderate limitations in interacting with others.
>
> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant reported she could not concentrate or focus and had difficulty completing tasks. (Exhibits 3E, Hearing Testimony). However, she acknowledged she could also shop, prepare meals, perform household tasks, handle money, watch television or color with the need to get up and move due to pain. (Hearing Testimony, Exhibit 15F). On examinations, she showed good attention. (Exhibits 5F, 9F, 15F). She was able to assist in planning a small wedding and lived

on her own. (Exhibits 15F, 19F, 23F). Given the evidence, the undersigned concludes there are only moderate limitations in concentration, persistence, or pace.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant's records show some impairments in insight and judgment; however, with treatment compliance, her insight and judgment were assessed as "fair." (Exhibits 5F, 9F, 15F). The claimant has been capable of living on her own and completing personal tasks such as preparing meals, shopping, attending church, as well as hobbies such as coloring, listening to music, reading, and watching television. (Exhibits 15F, 18F, Hearing Testimony). She told one provider she was able to babysit and she engaged in a relationship, which ultimately ended in a small wedding and marriage. (Exhibits 15F, 19F, Hearing Testimony). Her mental health care has been generally conservative, with medication management and case management; she has not had exacerbations of symptoms resulting in any need for a higher level of care. (Exhibits 15F, 19F, 23F). Therefore, there are no more than moderate limitations in adapting or managing oneself.

(R. at 111–12).

Accordingly, the ALJ properly considered the supportability and consistency of the state agency psychologists' opinions. And her conclusion that they were persuasive insofar as they opined moderate limitations in the four functional areas is supported by substantial evidence.

Moreover, Plaintiff says that the way the ALJ diverged from the opinions of the state agency psychologists was harmful. She says "[t]he ALJ d[id] not adequately articulate why the opined limitation[s] to 'occasional and *superficial* interactions with others' (emphasis added) and 'less strict production quotas, pace, and standards' [were] not adopted." (Doc. 13 at 17). However, the ALJ did adopt corresponding limitations. The state agency psychologists opined that Plaintiff "would need a static work environment w[ith] less strict production quotas, pace, and standards." (R. at 245, 262). The ALJ found that Plaintiff had the RFC:

to understand, remember, and carry out short, simple instructions in performing simple routine unskilled tasks as identified by the DOT where such tasks are no subject to a strict quota system, do not involve a machine setting the pace of the work, and which have flexible standards as to the time, quality, and quantity[.]

(R. at 113). On their face, the ALJ's limitations are more detailed than those opined by the state agency psychologists. Plaintiff does not explain how these more detailed restrictions regarding

quotas, pace, and standards materially affect the non-disability finding or how they represent a significant departure from what was opined by the state agency psychologists.  Nor did Plaintiff's counsel elicit any testimony from the vocational expert to that effect at the hearing.

Similarly, the state agency psychologists opined variously that Plaintiff "would need superficial interactions w[ith] others" (R. at 246) and "would need occas[ional] and superficial interactions w[ith] others" (R. at 263).  The ALJ found that Plaintiff had the RFC:

> to perform work requiring up to occasional work in coordination with or in proximity to others; . . . to ask simple questions or request assistance; [ ] to accept instructions from and respond appropriately to criticism by supervisors; [ ] to interact with coworkers occasionally; . . . to interact appropriately with the general public occasionally.

(R. at 113).  "Superficial" interaction limitations have been interpreted to describe the depth of social interaction of which a Plaintiff is capable.  *See Corey v. Comm'r Soc. Sec.*, No. 2:18-cv-1219, 2019 WL 3226945, at *4 (S.D. Ohio July 17, 2019); *Lindsey v. Comm'r Soc. Sec.*, No. 2:18-CV-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018); *Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018).  Though the ALJ did not employ the word "superficial" in her RFC determination, she carefully considered the type of social interaction Plaintiff could handle.  Namely, she found that Plaintiff could work in coordination with others, could accept instructions and criticism from supervisors, and could interact appropriately with the general public.

"Superficial" social interaction has no regulatory definition.  And while the state agency psychologists opined Plaintiff should be limited to superficial interactions, neither defined what "superficial" meant.  Accordingly, precisely how the RFC's limitations differ from superficial interaction limitations—if they do at all—is unclear.  Still, even if the depth of interaction described in the RFC exceeds "superficial" interaction, the ALJ was not required to adopt the state agency psychologists' opinions in their entirety.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267,

276 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (noting that an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."); *Ferguson v. Comm'r of Soc. Sec.*, No. 2:18-CV-1024, 2019 WL 2414684, at *5 (S.D. Ohio June 7, 2019) ("Nor, as the case law above makes clear, was the ALJ required to explain why he did not adopt their opinions in full."), *report and recommendation adopted sub nom. Ferguson v. Comm'r of Soc. Sec.*, No. 2:18-CV-1024, 2019 WL 3083112 (S.D. Ohio July 15, 2019). And Plaintiff does not support, nor does the Undersigned find, that the ALJ's conclusion is not supported by substantial evidence.

Notably, the ALJ found that Plaintiff was only moderately limited in her ability to interact with others, supported primarily by Plaintiff's own testimony and representations she made at mental health appointments. (R. at 111). Plaintiff endorsed anxiety with others, especially in larger crowds. (*Id.*) (citing R. at 379–86, 1429–40, 165–204); (*see, e.g.,* R. at 187) (Plaintiff testifying that she does not like big crowds, and a crowd of fifteen or more people might be an issue for her). Yet, Plaintiff acknowledged outings with others and improvements in her anxious symptoms at mental health appointments. (R. at 111) (citing R. at 494–558, 797–881, 1429–40); (*see, e.g.,* R. at 522) (Plaintiff reporting that she "[w]ill get out around others when needed."); (R. at 527) (Plaintiff reporting getting out and attending a local festival); (R. at 531) (Plaintiff reporting going to the store as needed, with anxiety, but "able to get through it."). She further noted that she attended church multiple times a week, babysat, was in a relationship, and hosted a small wedding of about ten people. (R. at 111) (citing R. at 379–86, 1429–40, 165–204); (*see, e.g.,* R. at 383) (Plaintiff reporting she goes to church every Wednesday and Sunday); (R. at 1434) (Plaintiff reporting "things

are going okay with [her] boyfriend . . . . Will go to the lake with her boyfriend. Out to eat. Trying

to be a little more social. Still some anxiety in larger crowds, but is working on this.").  And though

her affect sometimes presented as constricted or blunted, it was generally cooperative and

appropriately interactive.  (R. at 111) (citing R. at 494–558, 797–881, 1429–40).

All told, the ALJ's determinations in the RFC regarding Plaintiff's depth of social

interaction were supported by substantial evidence.  The Undersigned finds Plaintiff's allegation of

error regarding the opinions of the state agency psychologists without merit.

### B.  Occupational Therapist Blair Taylor

The ALJ discussed the medical source opinion of occupational therapist Blair

Taylor as follows:

> After the functional capacity examination in August 2020, therapist Blair Taylor
> concluded [Plaintiff] should avoid dynamic balancing, stair and ladder climbing,
> repetitive or sustained squatting, repetitive or sustained kneeling, or sustained
> crawling. She could otherwise occasionally perform walking, trunk rotation, back
> extension, stooping or bending, pinching, firm gripping, fine or gross motor
> handling or manipulating, forearm pronation or supination, wrist flexion or
> extension, overhead reaching and forward reaching, and neck flexion and
> extension. She could frequently perform static balancing and could frequently
> perform simple gripping. She could occasionally lift 24 pounds in a stoop or
> bending lift from the floor and frequently lift 14 pounds. She could occasionally
> power lift 22 pounds from the floor or from waist to shoulder. She could
> occasionally lift 10 pounds from shoulder to overhead and frequently lift five
> pounds. She could perform bilateral carry occasionally but should avoid pushing or
> pulling. Blair Taylor concluded [Plaintiff] could perform light work but was unable
> to tolerate consistent paced tasks such as walking, lifting, and carrying; she would
> need adequate rest breaks and pacing. She also noted [Plaintiff] had a slight
> decrease in cognitive abilities; her simple mental abilities appeared to be intact, but
> complex problem solving appeared impaired. She noted [Plaintiff] gave consistent
> effort throughout and limitations included decreased body mechanics, low back
> pain, weakness, and decreased range of motion. (Exhibit 18F). This opinion is not
> persuasive. It is vague in that it gives not definitions of terms used and does not
> quantify the limitations. The opinion does not define "adequate" rest breaks or
> pacing, and does not explain consistent paced tasks. (Exhibit 18F). These terms are
> not helpful as there is nothing provided to determine how they translate into
> recognizable vocational terms. Additionally, the assessment is not fully supported
> by the examination. Therapist Taylor observed generally mildly decreased strength
> but indicated [Plaintiff] could not do any pushing or pulling. [Plaintiff]

> acknowledged she could perform independent activities of daily living and get in and out of her second-story home, but therapist Taylor opined she should avoid stair climbing and could only occasionally perform walking. (Exhibit 18F). These limitations are not consistent with [Plaintiff]'s reported daily activities or with primary care examinations noting only tenderness and some limited range of motion during 2020 examinations. (Exhibits 13F, 16F).

(R. at 122).

Plaintiff takes issue with the ALJ's rejection of the opined limitations for "adequate" rest breaks, no pushing or pulling, and no stair climbing and occasional walking, and says the rejections were not supported by substantial evidence. (Doc. 13 at 15–19). The Undersigned finds this allegation of error without merit.

Regarding breaks, the ALJ noted that Ms. Taylor's opined limitation for "adequate" breaks was undefined. (R. at 122) (citing R. at 1462 (stating Plaintiff "would need adequate rest breaks and pacing.")). The ALJ chose not to accommodate breaks into the RFC but did implement limitations on the pacing of Plaintiff's work. (R. at 113). Though Ms. Taylor did not cite particular supporting evidence for this limitation, because it was labeled as Plaintiff's "Physical Demand Level", it appears to be based on her understanding of Plaintiff's physical capabilities as a whole. (R. at 1462). The ALJ carefully explained why that understanding was incompatible with the ALJ's own understanding of the evidence of record and Ms. Taylor's own findings.

For example, Ms. Taylor opined that Plaintiff should avoid pushing and pulling. (R. at 1462). But the ALJ noted that this was unsupported by Ms. Taylor's own observations of only mildly decreased strength. (R. at 122); (*see* R. at 1458) (noting approximately 4/5 bilateral shoulder, elbow, and wrist strength). The ALJ further noted that the opinion was inconsistent with examinations noting only tenderness and reduced range of motion, not decreased strength. (R. at 122) (citing R. at 1294–1322, 1441–50 (progress notes containing normal findings on examination

of extremities)).  And it was also inconsistent with the state agency medical consultants, both of whom opined that Plaintiff had unlimited capacity for pushing and pulling.  (R. at 243, 260).

Ms. Taylor's opinion that Plaintiff could only occasionally walk and should avoid stairs was similarly incompatible with substantial evidence relied upon by the ALJ.  (R. at 1460).  The ALJ noted that the opinion was unsupported by Plaintiff's own representations to Ms. Taylor that she could independently perform activities of daily living and get in and out of her second-story home. (R. at 122); (*see* R. at 1458 (noting that Plaintiff performed independently activities of daily living, though with some difficulty, and could get up and down stairs, though with reported increased pain)).  Additionally, the ALJ found the opinion inconsistent with Plaintiff's other reported daily activities.  (R. at 122); (*see, e.g.,* R. at 382) (Plaintiff noting that when going out, she travels by walking).  Elsewhere, the ALJ noted that though Plaintiff used a walker during an acute episode of cellulitis, the records generally did not support an inability to ambulate effectively, and demonstrated that Plaintiff had an independent, if abnormal, gait.  (R. at 110) (citing R. 463–93, 559–75, 1456–63).  And the state agency medical consultant who performed Plaintiff's initial review, whom the ALJ found persuasive as to Plaintiff's physical limitations (R. at 120), opined that Plaintiff could stand and/or walk for six hours in an eight-hour day and could occasionally climb stairs (R. at 243).

In sum, the ALJ's rejection of some of Ms. Taylor's opined limitations is supported by substantial evidence, and Plaintiff's allegation of error is without merit.

### C.  Clinical Supervisor Abigail McGee

The ALJ discussed the medical source opinion of Abigail McGee, M.Ed. as follows:

[I]n August 2020, clinical supervisor Abigail McGee, M.Ed[.], LPCC-S, completed a mental impairment questionnaire. She noted she first saw [Plaintiff] in May 2019 and had contact with her two to five times per month. Diagnoses included PTSD, unspecified intellectual disability, and unspecified bipolar disorder. Symptoms

included inability to initiate and persist in goal-directed activities; social withdrawal; flat or inappropriate affect; avoidance of feelings, activities, objects, places or people; pain and other abnormalities of sensation; high level of anxiety about personal health issues; panic attacks followed by a persistent concern or worry about additional panic attacks; difficulty making independent decisions; irritable, depressed, elevated, or expansive mood; difficulty concentrating or thinking; sleep disturbances; an increase or decrease in energy; frequent physical complaints; easy fatigue; restlessness; muscle tension; and disturbances of mood. Her prognosis was chronic, and she noted treatment helped maintain current level of functioning. In assessing functional capacities, Ms. McGee assessed "marked" limitations in all areas. "Marked" meant [Plaintiff]'s functioning independently, appropriately, effectively, and on a sustained basis was seriously limited and her impairment would interfere with functioning one-third but less than two-thirds of the time on a consistent basis in an eight-hour workday. She assessed marked limitations in understanding and learning terms, instructions, and procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; using reason and judgment to make work-related decisions; cooperating with others or handling conflicts with others; asking for help when needed; initiating or sustaining conversation or understanding and responding to social cues; responding to requests, suggestions, criticism, correction, and challenges; keeping social interactions free of excessive irritability, sensitivity, and argumentativeness; initiating and performing a known and understood task; working at an appropriate and consistent pace and completing tasks timely; ignoring or avoiding distractions while working; changing activities and work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; working a full day without needing more than the allotted number or length of rest periods; responding to demands; adapting to changes; managing psychologically-based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals and making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; being aware of normal hazards and taking appropriate precautions. She assessed marked limitations in understanding, remembering, or applying information; in interacting with others; in concentration, persistence, or maintaining pace; and in adapting or managing herself. She noted [Plaintiff] relied on medical treatment, mental health therapy, and psychosocial supports on a regular basis. She indicated [Plaintiff] had minimal capacity to adapt to changes in the environment or changes not already a part of daily life; that changes or increased demands would lead to exacerbation of symptoms or deterioration of functioning; and changes or increased demands would render her unable to function outside the home without substantial psychosocial supports. Her limitations were reported since childhood and she would be absent from work more than four days per month due to her mental health. She also noted [Plaintiff] was easily taken advantage of by others. (Exhibit 17F). This opinion is not persuasive. Marked limitations in all

21

areas are not consistent with [Plaintiff]'s ability to live on her own, even with some case management assistance. [Plaintiff] has been capable of living on her own, attending church, and babysitting; she was also able to meet a boyfriend and maintain a relationship to the point of marriage. She could travel on public transportation, go out to eat, socialize, shop, and attend doctors' appointments alone. (Hearing Testimony, Exhibits 15F, 18F, 19F). Though mental status evaluations support some limitations in insight, judgment, and estimated intelligence, she has not persistently shown abnormalities of the severity to support ongoing marked limitations. Moreover, [Plaintiff] reported improvement with medications and did not require a higher level of care. (Exhibits 5F, 9F, 15F). Given the conservative care and independent activities of daily living supported by the record, the [ALJ] concludes the evidence is more consistent with moderate functional limitations and these are supported by the limitations in the residual functional capacity above.

(R. at 122–23).

Plaintiff says that in finding Ms. McGee's opinion unpersuasive, the ALJ unduly relied on Plaintiff's activities of daily living, some of which required case management support to complete, and overlooked evidence in the record showing the severity of Plaintiff's mental health symptoms. (Doc. 13 at 22–23).  The Undersigned finds this allegation of error without merit.

Notably, the ALJ conceded that the Plaintiff needed some "case management assistance[,]" and that some "mental status evaluations support some limitations in insight, judgment, and estimated intelligence[.]"  (R. at 123).  Yet, she found that the weight of the record as a whole supported that Plaintiff could live relatively independently and "has not persistently shown abnormalities of the severity to support ongoing marked limitations."  So rather than selectively reading the record, as Plaintiff seems to suggest, the ALJ was simply weighing the majority of the evidence against a minority of the evidence.

Indeed, the ALJ elsewhere carefully described why the evidence of record supported only "moderate" limitations in the four functional areas (R. at 111–12)—whereas Ms. McGee opined "marked" limitations (R. at 1452–54).  And the ALJ found both state agency psychologists persuasive to the extent they found Plaintiff had only moderate limitations in functioning.  (R. at

22

120–21).  Moreover, that ALJ found that Plaintiff's "borderline intellectual functioning and symptoms of depression and anxiety have been managed with conservative care, even with medication non-compliance[,]" and that Plaintiff experience improved symptoms with medications. (R. at 118) (citing R. at 1429–40, 1464–96 (noting mild to moderate depression, and generally fair mental status exam findings, throughout 2020)).

In sum, the ALJ's finding that Ms. McGee's opinion was unpersuasive is supported by substantial evidence, and Plaintiff's allegation of error is without merit.

**IV.    CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**V.    PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court

adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   February 7, 2023                          /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE